**UNITED MATTRESS MACHINERY CO., Inc. v. HANDY BUTTON MACHINE CO.**

No. 11020.

United States Court of Appeals Third Circuit.

Argued June 17, 1953.

Decided July 29, 1953.

As Amended Oct. 16, 1953.

Henry N. Paul, Jr., and Robert B. Frailey, Philadelphia, Pa., Cedric W. Porter and Nathan Heard, Boston, Mass., for appellant (Paul & Paul, Philadelphia, Pa., Heard, Smith, Porter & Chittick, Boston, Mass., Berl, Potter & Anderson, Wilmington, Del., on the brief).

Dugald S. McDougall, Chicago, Ill., for appellee (Thomas Cooch and Connolly, Cooch & Bove, Wilmington, Del., on the brief).

Before MARIS, McLAUGHLIN and KALODNER, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Appellant, a Maine corporation engaged in the manufacture of mattress making machinery and mattress tufting buttons, seeks the reversal of an adverse judgment in this patent infringement suit brought by it against appellee, a Delaware corporation which, among other things, also manufactures mattress tufting buttons. The subject of the liti-

gation is Mathewson patent No. 2,421,-280, granted May 27, 1947, and subsequently assigned to appellant. Infringement having been conceded the sole question here presented is whether the Mathewson patent is valid. Appellee offered no testimony, but introduced into evidence two earlier patents which it claimed anticipated Mathewson.

Since the district court opinion, D.C.Del.1953, 108 F.Supp. 899, was rendered after January 1, 1953, although the trial was held before that date, the 1952 Patent Act[1] governs this case. See Sec. 4 of the Act, supra Note 1, 66 Stat. 815, 35 U.S.C.A. note preceding section 1, and Stanley Works v. Rockwell Mfg. Co., 3 Cir., 1953, 203 F.2d 846, 849.

As may be surmised, the patent in question relates to a mattress tufting button. The background on this patent is briefly this. In order to keep the stuffing material in mattresses from shifting around inside the cover, or ticking, mattress manufacturers have for many years tufted the mattresses. This process consists of drawing cords through the mattress from top to bottom. The cords were fastened to the ticking in several different ways, an early method having been to pass the cord over the outside of the ticking and back through the mattress at another point so as to form a large loop. Leather tabs or cotton wicking was used under the cord where it passed over the ticking. This method was unsatisfactory because as the mattress was compressed the cord became loose. To solve this problem cotton balls or tufts were placed on the outside of the mattress and tied to single strands of cord which had been passed through the stuffing.

In 1933 plaintiff patented an automatic button tufting machine which used fiber buttons having a U-shaped shank to which the cotton cord was fastened. Both this button and a later-developed metal head button, which was used because it would not chip when fed through plaintiff's button tufting machine, were unpatented. Although both are, to a certain extent, still in use today, they were not entirely successful because of a tendency to "pop out" upon pressure being put on the mattress or when the tufting cord was broken. Once they popped out it was difficult to replace them in the mattress. Several attempts to eliminate this condition were made but none was completely satisfactory until the development in 1944 of the Mathewson button. The latter is described in the application as "having a substantially flat head which seats against the outer surface of the mattress and an inward centrally projecting shank secured in the head, said shank having a short neck section to extend through the mattress covering, and a loop section presenting shoulder portions extending from and transversely of the neck section toward the rim of the head and adjacent the covering-engaging surface of the head at a distance therefrom sufficient to receive the covering and acting to prevent the shank from working out of the covering * * *." The heart-shaped shank made the insertion of the button into the mattress easy and its withdrawal difficult, thus solving the popping out problem which had perplexed the industry.

Appellant is the sole manufacturer of automatic tufting machines. The Mathewson button is designed for use in these machines, as is defendant's. There was evidence at the trial that if buttons of a type unlike Mathewson or that manufactured by defendant are used it necessitates making adjustments to the tufting machine which are both costly and time-consuming.[2] It is thus understandable that there is a demand in the trade for these two types of buttons.

---

1. Act of July 19, 1952, c. 950, Sec. 1, 66 Stat. 792, 35 U.S.C. § 1 et seq.

2. Conversion of the machine to receive other types of buttons is effected by one of plaintiff's servicemen and requires from one-half hour to three hours, according to the witnesses. This extra element of cost, says defendant, is ruinous in the highly competitive mattress making industry.

After the Mathewson patent application was filed it was placed in interference by one Williams on the ground that prior art had anticipated the patent. The prior art relied on by Williams was, among others, Churchill patent No. 2,-055,427 and Place patent No. 2,197,590, known as the second Place patent. Both patents involve spring fasteners for securing molding strips to automobile bodies and are similar in appearance and function to the Mathewson patent. The Examiner of Interferences, however, denied Williams' motion to dissolve the Mathewson application. While, insofar as we have been informed, he did not refer to the second Place patent, he distinguished the Churchill patent on the ground that it did not call for the shank to be embedded in the head. Similar distinctions were made with respect to other patents considered by the Examiner which Williams claimed anticipated Mathewson.

It is true that a patent is presumptively valid and that the burden of establishing its invalidity is on the party asserting it. 35 U.S.C. § 282. Further, we agree with appellant that this presumption is strengthened in cases where, as here, the Patent Office has allowed the patent after interference proceedings in which prior art was considered and rejected. Container Co. v. Carpenter Container Corp., D.C.Del.1951, 99 F.Supp. 167, 170, affirmed 3 Cir., 1952, 194 F.2d 1013, certiorari denied 344 U.S. 826, 73 S.Ct. 26. Nevertheless, an examination of the prior art relied on by defendant—the Churchill patent and the first Place patent, No. 1,992,093, also involving a spring fastener used in the automobile trade—convinces us that the trial court properly found that Mathewson was anticipated by Churchill and Place.

The one readily ascertainable difference between the prior art and Mathewson is in the shape of the outer portion of the patented article.[3] This, however, was not claimed by Mathewson to be novel, nor could it have been. Indeed, the shape of the head presently used on the Mathewson button is not the same as that shown in the patent application.

The sole substantial distinction between the prior art and Mathewson pertinent to our inquiry, and the only one urged by appellant, is that the former does not have the shank affixed to the head. As noted above, it was this feature of Mathewson which led the Examiner to uphold the patent in the Williams interference proceedings. We are of the opinion that patent-wise this is a distinction without a difference. Because of the nature of the materials on which the respective patents are used the Churchill and Place inventions, unlike Mathewson, do not have a fixed shank, Mathewson requiring a fixed device which is self-locking upon being inserted into the soft mattress whereas the Churchill and Place patents, inserted as they are in rigid material, need a flexible outside part which can be tightly locked by twisting it with pliers. The district court found with respect to this alleged difference in the Mathewson patent that it is the mere adaptation of the arrowhead principle, as found in Churchill and Place, to the quality of the material engaged, an application of the teachings of the prior art to the tufting button. We cannot say that these findings constitute reversible error. In arriving at this conclusion we are aware of the rule that "where, with all the evidence before the court, it appears that no substantial dispute of fact is presented, and that the case may be determined by a mere comparison of structures and extrinsic evidence is not needed for purposes of explanation, or evaluation of prior art, or to resolve questions of the application of descriptions to, subject-matter, the questions of invention and infringement may be determined as questions of law." United States v. Esnault-Pelterie, 303 U.S. 26, 30, 58 S.Ct.

---

3. Although the first Place patent is described in the application as having a head and shank neither it nor the Churchill patent has the type of head found in Mathewson. They have, instead, a metal strip which is twisted to effect the locking action.

412, 414, 82 L.Ed. 625, and cases there cited.

Appellant does not in so many words contend that its button is patentable because it involves a new use of prior art,[4] nor does it unequivocally state that it should prevail because the fixed-in-head shank is per se a patentable novelty. As we see this case it is not important whether or not appellant's claim is characterized as a new use of prior art—the question in either event is: does it constitute invention?

█ The fact that Mathewson uses a fixed rather than a flexible head adds nothing which is patentable to the prior art. As the district court found, the salient feature of Mathewson, like the prior art, is the embodiment of the arrowhead principle of the shank. Even if it be conceded that the fixed-in-head shank of Mathewson is a "new and useful" improvement of the Churchill and Place patents within the meaning of 35 U.S.C. § 101 of the 1952 Act,

"§ 101. Inventions patentable.

"Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title. July 19, 1952, c. 950, § 1, 66 Stat. 797.",

it is not an "invention" as that term is used in patent law. The cases are legion which hold that a patentable invention does not consist of the application of an old device to a new and analogous use.[5] See, for example, General Electric Co. v. Jewel Incandescent Lamp Co., 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43; Merit Mfg. Co. v. Hero Mfg. Co., 2 Cir., 1950, 185 F.2d 350; R. G. Le Tourneau, Inc., v. Gar Wood Industries, 9 Cir., 1945, 151 F.2d 432, certiorari denied 327 U.S. 782, 66 S.Ct. 683, 90 L.Ed. 1010, and Continental Scale Corporation v. Harrison Wholesale Co., 7 Cir., 1942, 132 F.2d 463.

35 U.S.C. § 103 for the first time enacts some of the teachings of the decisional law on this point into statutory form:

"§ 103. Conditions for patentability; non-obvious subject matter

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which

4. We are told that "[t]his is not a case of *mere* new use." (Emphasis supplied). Reply brief, p. 3.

5. It would seem, however, that process patents may be granted for a new use in situations where products would not qualify. In General Electric Co. v. Jewel Incandescent Lamp Co., 3 Cir., 1944, 146 F.2d 414, 416, affirmed 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43, Judge Biggs, speaking for this court said:
"As product claims there is an insuperable bar to their validity. They appropriate an old product. If the claims of the patent were process claims and appropriated the two step process of Pipkin's specifications they might be held valid under the principle enunciated in Ansonia Brass & Copper Co. v. Electric Supply Co., 144 U.S. 11, 18, 12 S.Ct. 601, 604, 36 L.Ed. 327. In the cited case Mr. Justice Brown stated '* * * if an old

device or process be put to a new use, which is not analogous to the old one, and the adaptation of such process to the new use is of such a character as to require the exercise of inventive skill to produce it, such new use will not be denied the merit of patentability.' But it is obvious that the principle quoted cannot be extended for the benefit of a patentee who claims nothing more than a product old in the art."
This distinction between processes and products is also made in the new Act. 35 U.S.C. § 100(b) defines "process" thus:
"The term 'process' means process, art or method, and includes a new use of a known process, machine, manufacture, composition of matter, or material."
The Act contains no comparable language respecting the new use of prior art products as such.

the invention was made. July 19, 1952, c. 950, § 1, 66 Stat. 798."[6]

It is significant that in most of the pertinent cases the proponent of the new use, like Mathewson, made a physical alteration in the prior art which enabled him to use the established principles of that art in a different way. But such a change in form, while calling for mechanical ingenuity, is not invention. Congress has made no attempt to define the term "invention", either under the older law or in the new Patent Act. Instead, the courts, aided only by case law, have had to determine for themselves what constitutes invention and what does not. We are satisfied that neither under 35 U.S.C. § 103 nor under any of the numerous tests promulgated by the courts does the Mathewson button, by using a fixed rather than a flexible shank, qualify as an invention entitled to a patent monopoly.

The district court, while correctly concluding that the Mathewson patent is invalid for substantially the same reasons which we find persuasive, stated further that the button was unpatentable as not meeting the "flash of genius" test of Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 91, 62 S.Ct. 37, 86 L.Ed. 58. Whether this part of the lower court's opinion be regarded as dictum or as an alternative holding, because the foregoing discussion disposes of this appeal we do not find it necessary to decide what, if anything, is left of that much-discussed criterion of patentability since the enactment of the new patent statute, particularly the second sentence of Section 103, above. Cf. the second paragraph of the Reviser's Note following

ing 35 U.S.C. § 103, supra Note 6 and House Report No. 1923, p. 18, 82nd Congress, 2nd Session, with Thys Co. v. Oeste, D.C.N.D.Cal.1953, 111 F.Supp. 665, 674.

Appellant's remaining points have been considered and found to be without substance.

The judgment will be affirmed.

---

6. The Reviser's note following this section states:

"There is no provision corresponding to the first sentence explicitly stated in the present statutes, but the refusal of patents by the Patent Office, and the holding of patents invalid by the courts, on the ground of lack of invention or lack of patentable novelty has been followed since at least as early as 1850. This paragraph is added with the view that an explicit statement in the statute may have some stablizing effect, and also to serve as a basis for the addition at a later time of some criteria which may be worked out.

"The second sentence states that patentability as to this requirement is not to be negatived by the manner in which the invention was made, that is, it is immaterial whether it resulted from long toil and experimentation or from a flash of genius."